## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

GRAND STREET DINING, LLC,      )
GSD LENEXA, LLC, and      )
TREZOMARE OPERATING COMPANY, )
LLC, each individually and on behalf   )    Case No. _____
of all others similarly situated,     )
          )
    Plaintiffs,      )    **JURY TRIAL DEMANDED**
          )
v.          )
          )
THE CINCINNATI INSURANCE     )
COMPANY,         )
          )
    Defendant.     )

## CLASS ACTION COMPLAINT

Plaintiffs Grand Street Dining, LLC, GSD Lenexa, LLC, and Trezomare Operating Company, LLC, each individually and on behalf of the other members of the below-defined nationwide Plaintiffs' classes (collectively, the "Insured Class"), bring this class action against Defendant The Cincinnati Insurance Company, and in support thereof state and allege the following:

### I.    NATURE OF THE ACTION

1.    This action arises out of The Cincinnati Insurance Company's failure to provide insurance coverage for the losses sustained and expenses incurred by Plaintiffs because of the ongoing Coronavirus (COVID-19) pandemic.

2.    For many years, Plaintiffs have owned and operated full-service fine dining restaurants in the Kansas City metropolitan area. Plaintiffs' restaurants also provide catering services and wedding and event space. Plaintiffs' operations have been and continue to be

suspended and threatened by the novel coronavirus, SARS-CoV-2, which causes the infectious disease COVID-19.

3.      To protect their businesses in the event that they suddenly had to suspend operations for reasons outside of their control, or in order to prevent further property damage, Plaintiffs purchased insurance coverage from The Cincinnati Insurance Company, including property coverage, as set forth in The Cincinnati Insurance Company's Building and Personal Property Coverage Form and Business Income (and Extra Expense) Coverage Form.

4.      The Cincinnati Insurance Company's coverage forms provide "Business Income" coverage, which promises to pay for actual loss due to the necessary suspension of operations caused by accidental physical loss or accidental physical damage to the covered property.

5.      The Cincinnati Insurance Company's coverage forms also provide "Extra Expense" coverage, which promises to pay the necessary expenses incurred to avoid or minimize the suspension of business and to continue operations.

6.      The Cincinnati Insurance Company's coverage forms also provide "Civil Authority" coverage, which promises to pay for loss caused by action of civil authority that prohibits access to the premises.

7.      The Cincinnati Insurance Company's coverage forms, under sections titled "Duties in the Event of Loss," require in the event of a loss that the policy holder take all reasonable steps to protect the Covered Property from further damage, and keep a record of the expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.

8.     Unlike some policies that provide Business Income (also referred to as "business interruption") coverage, The Cincinnati Insurance Company's coverage forms do not include, and are not subject to, any exclusion for losses caused by viruses or communicable diseases.

9.     Plaintiffs were forced to suspend or reduce business at their restaurants due to COVID-19 and the ensuing orders issued by civil authorities in Missouri and Kansas mandating the suspension of business for on-site services, as well as in order to take necessary steps to prevent further damage and minimize the suspension of business and continue operations.

10.     Upon information and belief, The Cincinnati Insurance Company has, on a widescale and uniform basis, refused to pay its insureds under its Business Income, Extra Expense, Civil Authority, and Sue and Labor coverages for losses suffered due to COVID-19, any executive orders by civil authorities that have required the necessary suspension of business, and any efforts to prevent further property damage or to minimize the suspension of business and continue operations. In particular, The Cincinnati Insurance Company has denied claims submitted by Plaintiffs under their policies.

## II.     THE PARTIES

11.     Plaintiff Grand Street Dining, LLC is a Missouri limited liability company, with its principal place of business in Kansas City, Missouri. Plaintiff Grand Street Dining, LLC owns and operates Grand Street Cafe located at 4740 Grand Ave., Ste. 100, Kansas City, Missouri 64112.

12.     Plaintiff GSD Lenexa, LLC is a Kansas limited liability company, with its principal place of business in Lenexa, Kansas. Plaintiff GSD Lenexa, LLC owns and operates Grand Street Cafe located at 8815 Renner Ave., Lenexa, Kansas 66219.

3

13.     Plaintiff Grand Street Dining, LLC and Plaintiff GSD Lenexa, LLC are hereafter collectively referred to as "Grand Street."

14.     Plaintiff Trezomare Operating Company, LLC ("Trezomare") is a Missouri limited liability company, with its principal place of business in Kansas City, Missouri. Plaintiff Trezomare owns and operates Trezo Mare Restaurant located at 4105 N Mulberry Dr., Kansas City, Missouri 64116.

15.     Defendant The Cincinnati Insurance Company ("Cincinnati") is, and at all times relevant hereto has been, an insurance company writing insurance policies and doing business in the State of Missouri, capable of suing and being sued in the courts of this State. Defendant Cincinnati is a foreign corporation organized, incorporated and existing under the laws of the State of Ohio, with its principal place of business at 6200 S. Gilmore Road, Fairfield, Ohio 45014.

## III.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Plaintiffs and Defendant are citizens of different states, and because: (a) the Class consists of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to this claim.

17.     Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of this action is situated in this judicial district.

Case 4:20-cv-00330-HFS   Document 1   Filed 04/23/20   Page 4 of 32

## IV.    FACTUAL BACKGROUND

### a.    The Insurance Policies

18.    In return for the payment of a premium, Cincinnati issued Policy No. ECP0515325 to Grand Street, for a policy period of December 5, 2018 to December 5, 2021, including a Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form. Policy No. ECP0515325 is attached hereto as Exhibit A. Grand Street has performed all of its obligations under Policy No. ECP0515325, including the payment of premiums. The Covered Property, with respect to the Building and Personal Property Coverage Form, is the Grand Street Cafe restaurants located at 4740 Grand Ave., Ste. 100, Kansas City, Missouri 64112 and 8815 Renner Ave., Lenexa, Kansas 66219.

19.    In return for payment of a premium, Cincinnati issued Policy No. ECP0443843 to Trezomare for a policy period of July 1, 2017 to July 1, 2020, including a Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form. Policy No. ECP0443843 is attached hereto as Exhibit B. Trezomare has performed all of its obligations under Policy No. ECP0443843, including the payment of premiums. The Covered Property, with respect to the Building and Personal Property Coverage Form, is the Trezo Mare restaurant located at 4105 N Mulberry Dr., Kansas City, Missouri 64116.

20.    Each Plaintiff's Building and Personal Property Coverage Form, included within the policies attached as Exhibits A and B, includes identical Business Income, Extra Expense, Civil Authority, and Sue and Labor coverages.

21.    Sometimes property insurance is sold on a specific peril basis, where coverage is limited to risks of loss that are specifically listed (e.g., hurricane, earthquake, H1N1, etc.). Many property policies sold in the United States, however, including those sold by Cincinnati, are "all-

5

risk" property damage policies. These types of policies cover all risks of loss except for risks that are expressly and specifically excluded.

22.     Under the heading "Covered Causes of Loss," Cincinnati agreed to pay for "direct 'loss' unless the 'loss' is excluded or limited" in the policies.

23.     Cincinnati did not exclude or limit coverage for losses from viruses in Plaintiffs' policies or those of the other Class members.

24.     Losses due to COVID-19 are a Covered Cause of Loss under the Cincinnati policies with the Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form.

25.     In the Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form, Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of their operations during the "period of restoration" caused by direct "loss" to property at the covered premises.

26.     "Loss" is defined to mean accidental physical loss or accidental physical damage.

27.     "Suspension" is defined to mean the slowdown or cessation of business activities and that part or all of the covered premises is rendered untenable.

28.      "Period of restoration" is defined to mean the period of time that begins at the time of direct loss.

29.     "Business Income" is defined to mean net income (net profit or loss before income taxes) that would have been earned or incurred and continuing normal operating expenses sustained, including payroll.

30.     The presence of virus or disease can constitute physical loss of or damage to property, as the insurance industry has recognized since at least 2006. When preparing so-called

6

"virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm—Insurance Services Office, Inc. or "ISO"—circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

31. The ISO also created a new "amendatory endorsement" to exclude loss due to virus or bacteria from coverage afforded by certain insurance policies. The ISO amendatory endorsement states that there is "no coverage for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease" (the "Virus Exclusion").

32. Some insurers added the Virus Exclusion to their policies that provide Business Income (also referred to as "business interruption") coverage. Cincinnati's Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form, however, do not include, and are not subject to, any exclusion for losses caused by viruses or communicable diseases.

33. In the Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form, Cincinnati also agreed to pay necessary Extra Expense that its insureds sustain during the "period of restoration" that the insureds would not have sustained if there had been no direct loss to property caused by or resulting from a Covered Cause of Loss.

7

34.     "Extra Expense" includes expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

35.     Cincinnati also agreed to "pay for the actual loss of 'Business Income'" sustained "and necessary Extra Expense" sustained "caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes direct damage to property other than the Covered Property, the civil authority prohibits access to the area immediately surrounding the damaged property, and "the action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage…."

36.     Cincinnati's coverage forms, under sections titled "Duties in the Event of Loss," require in the event of a loss that the policy holder take all reasonable steps to protect the Covered Property from further damage, and keep a record of the expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This is commonly referred to as "Sue and Labor" coverage.

37.     Losses caused by COVID-19 and the related orders issued by local, state, and federal authorities triggered the Business Income, Extra Expense, Civil Authority, and Sue and Labor provisions of the Cincinnati policies.

   **b.  COVID-19 and the Covered Cause of Loss**

38.     Coronavirus (COVID-19) is a highly contagious virus that has rapidly spread and continues to spread across the United States.

39.     COVID-19 is spread by a number of methods, including "community spread," meaning that some people have been infected and it is not known how or where they became

8

exposed. Public health authorities, including the CDC, have reported significant ongoing community spread of the virus including instances of community spread in all 50 states.

40.     The CDC has reported that a person can be become infected with COVID-19 by touching a surface or object (like a fork, plate, table, or chair) that has the virus on it, and then touching their own mouth, nose or eyes.

41.     More specifically, COVID-19 infections are spread through droplets of different sizes which can be deposited on surfaces or objects.

42.     To reduce the spread of the disease, the CDC has recommended that businesses clean and disinfect all surfaces, prioritizing the most frequently touched surfaces.

43.     COVID-19 has been declared a pandemic by the World Health Organization.

44.     The COVID-19 pandemic is a public health crisis that has profoundly impacted American society, including the public's ability to patronize restaurants, bars and other establishments.

45.     The presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the suspension of business at a wide range of establishments, including civil authorities with jurisdiction over Plaintiffs' businesses (the "Closure Orders").

### i.  The Missouri Closure Orders

46.     On March 12, 2020, Quinton D. Lucas, the Mayor of the City of Kansas City, Missouri, issued a proclamation declaring a state of emergency, stating that the continued spread of COVID-19 constitutes a natural calamity and presents an imminent threat of widespread illness, which requires emergency action. The proclamation was ordered "to protect life and property" and permitted the city to order evacuations, close public places, impose curfews, limit public gathering and assemblies, and to order the closing of any and all businesses.

9

47. On March 21, 2020, Mayor Lucas issued a civil authority order stating in pertinent part:

    a. The COVID-19 virus spreads between people who are in close contact with one another through respiratory droplets produced when an infected person coughs or sneezes;

    b. A gathering of individuals without necessary mitigation for the spread of infection may pose a risk of the spread of infectious disease;

    c. That the City wishes to impose all means available under the law to protect public life, health, safety and property;

    d. That as of March 16, 2020, numerous cases of COVID-19 illness, including a fatality and evidence of community transmission, have been identified in jurisdictions bordering Kansas City; and

    e. That on March 20, 2020, the Kansas City Health Department confirmed 12 cases, including possible community spread, of the COVID-19 illness in Kansas City, Missouri.

48. Mayor Lucas' March 21, 2020 order required all individuals to stay at home unless performing "essential activities," and ordered all businesses to cease all in-person operations unless declared an "essential business." The order required all restaurants to suspend operations except for providing delivery or carry out only. The order was to remain in effect until 11:59 PM on April 24, 2020.

49. On March 21, 2020, the Governor of the State of Missouri issued a civil authority order limiting social gatherings of more than 10 people and directing that every person in the State of Missouri shall avoid eating or drinking at restaurants, bars, or food courts, provided,

however, that the use of drive-thru, pickup, or delivery options is allowed throughout the duration of the order. That order went into effect on March 23, 2020.

50.     On April 3, 2020, the State of Missouri entered an order directing all residents in Missouri to stay at home, imposing social distancing rules, limiting occupancy of buildings, and reiterated that "every person in the State of Missouri shall avoid eating or drinking at restaurants, bars, or food courts; provided, however, that the use of drive-thru, pickup, or delivery options is allowed throughout the duration of this Order." This order went into effect at 12:01 AM on April 6, 2020 and was to remain in force until 11:59 PM on April 24, 2020.

51.     On April 16, 2020, the State of Missouri amended the April 3, 2020 order and extended its enforcement to 11:59 PM on May 3, 2020.

52.     On April 16, 2020, Mayor Lucas amended the March 21, 2020 order and extended its enforcement to 12:01 AM on May 15, 2020.

53.     The Missouri Closure Orders were issued in response to the rapid spread of COVID-19 throughout Missouri and are civil authority orders requiring the suspension of Plaintiffs' businesses.

### ii.  The Kansas Closure Orders

54.     On March 12, 2020, the State of Kansas declared a state of disaster emergency due to the pandemic and public health emergency of COVID-19.

55.     On March 22, 2020, Johnson County, Kansas issued a Emergency Public Health Order stating that on March 19, 2020, the Board of County Commissioners of Johnson County, Kansas found that a disaster had occurred, or the threat thereof was imminent within Johnson County, Kansas as a result of the Coronavirus pandemic (COVID-19) and the confirmed outbreak and person-to-person spread of COVID-19 in Johnson County, Kansas. The Order

Case 4:20-cv-00330-HFS   Document 1   Filed 04/23/20   Page 11 of 32

stated that COVID-19 had been confirmed in Johnson County, Kansas and the conditions endanger health, safety and welfare of persons and property within the border of Johnson County, Kansas. As a result, the Order cancelled large gatherings, implemented social distancing requirements, ordered individuals to stay at home except to perform essential activities, and suspension of businesses unless excluded as essential. The Order required all restaurants to suspend operations except for providing delivery or carry out only, but expressly forbid consumption on the premises. This Order became effective at 12:01 AM on March 24, 2020 and was to remain in force until 12:01 AM on April 23, 2020.

56.     On March 28, 2020, the Governor of the State of Kansas issued Executive Order No. 20-16, which required Kansas residents to stay at home unless performing an essential activity. The order further restricted what businesses could continue operations and closed all restaurants except for preparing and serving meals for takeout or delivery. As of March 28, 2020, there had been 202 positive cases of COVID-19 in Kansas, spread among 31 counties.

57.     On April 11, 2020, the State of Kansas issued guidance regarding Executive Order No. 20-16 to make it clear that "dine-in service at restaurants and bars is not an essential function or essential activity and therefore remains prohibited…." The guidance further stated, "Restaurants and bars may not reopen for dine-in service."

58.     On April 16, 2020, the State of Kansas issued Executive Order No. 20-24, extending Executive Order 20-16 to May 3, 2020. As of April 16, 2020, there had been over 1,426 positive cases of COVID-19 in Kansas, spread among 62 counties, and 69 deaths as a result of the illness.

59.     The Kansas Closure Orders were issued in response to the rapid spread of COVID-19 throughout Kansas and are civil authority orders requiring the suspension of Plaintiffs' businesses.

### iii.   The Impact of COVID-19 and the Closure Orders

60.     Loss of use of property that has not been physically altered does constitute "physical loss or damage" for purposes of first-party property insurance.

61.     As the drafter of the policies, if Cincinnati had wished to exclude from coverage as "physical loss or damage" loss of use of property that has not been physically altered or deformed, it could have used explicit language stating such a definition, but it did not do so.

62.     The presence of COVID-19 caused direct physical loss of or damage to the covered property or "premises" under the Plaintiffs' policies, and the policies of the other Class members, by denying use of and damaging the covered property, and by causing a necessary suspension of operations during a period of restoration.

63.     The Closure Orders prohibited access to and use of Plaintiffs' and the other Class members' Covered Property, and the area immediately surrounding damaged property, in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage.

64.     As a result of the presence of COVID-19 and the Closure Orders, Plaintiffs and the other Class members lost Business Income and incurred Extra Expense.

### c.   Plaintiffs Submitted Notices of Loss to Cincinnati and were Wrongfully Denied Coverage

65.     Plaintiffs submitted notices of loss to Cincinnati under their policies due to the presence of COVID-19 and the Closure Orders, and Cincinnati denied those claims.

13

66.     On April 21, 2020, Cincinnati sent a letter to Grand Street ostensibly denying coverage for the losses sustained as a result of COVID-19 and the Closure Orders. Cincinnati's denial letter to Grand Street incorrectly stated that Cincinnati "cannot indemnify *Tiger Notions DBA Jazz A Louisiana* for any loss of business income from Coronavirus." (emphasis added). Upon information and belief, Cincinnati's denial letter to Grand Street was a cut-and-paste of a denial to another Cincinnati insured.

67.     On April 21, 2020, Cincinnati sent a denial letter to Trezomare ostensibly denying coverage for the losses sustained as a result of COVID-19 and the Closure Orders. Cincinnati's denial letter to Trezomare incorrectly stated that Cincinnati "cannot indemnify *[NAMED INSURED]* for any loss of business income from Coronavirus." (emphasis added).

68.     The denial letters that Cincinnati sent to Grand Street and Trezomare are nearly identical in form and substance.

69.      Upon information and belief, Cincinnati is using a form denial letter to deny coverage to all its insureds with policies similar to Plaintiffs.

## V.     CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this action, individually and on behalf of all others similarly situated, pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4), of the Federal Rules of Civil Procedure.

71.     Plaintiffs seek to represent nationwide classes for business income coverage defined as:

> a.   All persons and entities with Business Income coverage under a property insurance policy issued by Cincinnati that suffered a suspension of business

14

due to COVID-19 at the premises covered by the business income coverage (the "Business Income Declaratory Judgment Class").

b. All persons and entities that: had Business Income coverage under a property insurance policy issued by Cincinnati; suffered a suspension of business related to COVID-19, at the premises covered by their Cincinnati property insurance policy; made a claim under their property insurance policy issued by Cincinnati; and were denied Business Income coverage by Cincinnati for the suspension of business resulting from the presence or threat of COVID-19 (the "Business Income Breach Class").

72. Plaintiffs seek to represent nationwide classes for extra expense coverage defined as:

a. All persons and entities with Extra Expense coverage under a property insurance policy issued by Cincinnati that sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Cincinnati property insurance policy (the "Extra Expense Declaratory Judgment Class").

b. All persons and entities that: had Extra Expense coverage under a property insurance policy issued by Cincinnati; sought to minimize the suspension of business in connection with COVID-19 at the premises covered by their Cincinnati property insurance policy; made a claim under their property insurance policy issued by Cincinnati; and were denied Extra Expense coverage by Cincinnati despite their efforts to minimize the suspension of business caused by COVID-19 (the "Extra Expense Breach Class").

15

73.     Plaintiffs seek to represent nationwide classes for civil authority coverage defined

as:

    a.  All persons and entities with Civil Authority coverage under a property insurance policy issued by Cincinnati that suffered loss of Business Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Declaratory Judgment Class").

    b.  All persons and entities that: had Civil Authority coverage under a property insurance policy issued by Cincinnati; suffered loss of Business Income and/or Extra Expense caused by action of a civil authority; made a claim under their property insurance policy issued by Cincinnati; and were denied Civil Authority coverage by Cincinnati for the loss of Business Income and/or Extra Expense caused by a Closure Order (the "Civil Authority Breach Class").

74.     Plaintiffs seek to represent nationwide classes for sue and labor coverage defined

as:

    a.  All persons and entities with a Sue and Labor provision under a property insurance policy issued by Cincinnati that sought to prevent property damage caused by COVID-19 by suspending or reducing business operations, at the premises covered by their Cincinnati property insurance policy (the "Sue and Labor Declaratory Judgment Class").

    b.  All persons and entities that: had a Sue and Labor provision under a property insurance policy issued by Cincinnati; sought to prevent property damage caused by COVID-19 by suspending or reducing business operations, at the

16

premises covered by their Cincinnati property insurance policy; made a claim under their property insurance policy issued by Cincinnati; and were denied Sue and Labor coverage by Cincinnati in connection with the suspension of business caused by COVID-19 (the "Sue and Labor Breach Class").

75.     Excluded from each defined Class are Cincinnati and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend each of the Class definitions, as appropriate, during this litigation.

76.     This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

**Numerosity—Federal Rule of Civil Procedure 23(a)(1).**

77.     The members of each defined Class are so numerous that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are thousands of members of each Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from Cincinnati's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

**Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**

78.     This action involves common questions of law and fact, which predominate over any questions affecting only individual Class members, including, without limitation:

17

a. Cincinnati issued all-risk policies to the members of the Class in exchange for payment of premiums by the Class members;

b. whether the Class suffered a covered loss based on the common policies issued to members of the Class;

c. whether Cincinnati wrongfully denied all claims based on COVID-19;

d. whether Cincinnati's Business Income coverage applies to a suspension of business caused by COVID-19;

e. whether Cincinnati's Extra Expense coverage applies to efforts to minimize a loss caused by COVID-19;

f. whether Cincinnati's Civil Authority coverage applies to a loss of Business Income and Extra Expense sustained caused by the orders of state governors requiring the suspension of businesses as a result of COVID-19;

g. whether Cincinnati's Sue and Labor provision applies to require Cincinnati to pay for efforts to reduce damage caused by COVID-19;

h. whether Cincinnati has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss related to COVID-19 and the related closures; and

i. whether Plaintiffs and the Class are entitled to an award of reasonable attorney fees, interest and costs.

**Typicality—Federal Rule of Civil Procedure 23(a)(3)**

79. Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the other Class members are all similarly affected by Cincinnati's refusal to pay under its Business Income, Extra Expense, Civil Authority, and Sue and Labor coverages.

18

Plaintiffs' claims are based upon the same legal theories as those of the other Class members. Plaintiffs and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Cincinnati engaged.

**Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).**

80.     Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, including successfully litigating cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Plaintiffs intend to prosecute this action vigorously. The interests of the above-defined Classes will be fairly and adequately protected by Plaintiffs and their counsel.

**Inconsistent Adjudications and Impediments to Others—Federal Rule of Civil Procedure 23(b)(1).**

81.     Plaintiffs seek class-wide adjudication as to the interpretation, and resultant scope, of Cincinnati's Business Income, Extra Expense, Civil Authority, and Sue and Labor coverages. The prosecution of separate actions by individual members of the Classes would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Cincinnati. Moreover, the adjudications sought by Plaintiffs could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests.

**Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**

82.     Cincinnati acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members.

Superiority—Federal Rule of Civil Procedure 23(b)(3).

83.      A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.     LEGAL CLAIMS FOR RELIEF

### COUNT I – Declaratory Judgment – Business Income Coverage
### (Brought on behalf of the Business Income Declaratory Judgment Class)

84.      Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

85.      Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Declaratory Judgment Class.

86.      Plaintiffs' Cincinnati policies, as well as those of the other Business Income Declaratory Judgment Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs and the other Business Income Declaratory Judgment Class members' losses for claims covered by the policy.

87.      Plaintiffs and the other Business Income Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Business Income Declaratory Judgment Class members are entitled.

20

88. Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

89. An actual case or controversy exists regarding Plaintiffs and the other Business Income Declaratory Judgment Class members' rights and Cincinnati's obligations under the policies to reimburse Plaintiffs for the full amount of Business Income losses incurred by Plaintiffs and the other Business Income Declaratory Judgment Class members in connection with suspension of their businesses stemming from the COVID-19 pandemic.

90. Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Business Income Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

    a. Plaintiffs and the other Business Income Declaratory Judgment Class members' Business Income losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

    b. Cincinnati is obligated to pay Plaintiffs and the other Business Income Declaratory Judgment Class members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT II – Breach of Contract – Business Income Coverage**
**(Brought on behalf of the Business Income Breach Class)**

91. Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

21

92.     Plaintiffs bring this Count individually and on behalf of the other members of the Business Income Breach Class.

93.     Plaintiffs' Cincinnati policies, as well as those of the other Business Income Breach Class members, are contracts under which Cincinnati were paid premiums in exchange for their promise to pay Plaintiffs and the other Business Income Breach Class members' losses for claims covered by the policy.

94.     In the Building and Personal Property Coverage Form and Business Income (and Extra Expense) Coverage Form, Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

95.     A "slowdown or cessation" of business activities at the Covered Property is a "suspension" under the policy, for which Cincinnati agreed to pay for loss of Business Income during the "period of restoration" that begins at the time of direct loss.

96.     "Business Income" means net income (net profit or loss before income taxes) that would have been earned or incurred and continuing normal operating expenses sustained, including payroll.

97.     COVID-19 caused direct physical loss of or damage to Plaintiffs and the other Business Income Breach Class members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by COVID-19 thus triggered the Business Income provision of Plaintiffs and the other Business Income Breach Class members' Cincinnati policies.

98.     Plaintiffs and the other Business Income Breach Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by

22

Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

99.     By denying coverage for any Business Income losses incurred by Plaintiffs and the other Business Income Breach Class members in connection with the COVID-19 pandemic, Cincinnati has breached its coverage obligations under the policies.

100.    As a result of Cincinnati's breaches of the policies, Plaintiffs and the other Business Income Breach Class members have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

## COUNT III – Declaratory Judgment – Extra Expense Coverage
### (Brought on behalf of the Extra Expense Declaratory Judgment Class)

101.    Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

102.    Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Declaratory Judgment Class.

103.    Plaintiffs' Cincinnati insurance policy, as well as those of the other Extra Expense Declaratory Judgment Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs and the other Extra Expense Declaratory Judgment Class members' losses for claims covered by the policy.

104.    Plaintiffs and the other Extra Expense Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class members are entitled.

23

105.   Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

106.   An actual case or controversy exists regarding Plaintiffs and the other Extra Expense Declaratory Judgment Class members' rights and Cincinnati's obligations under the policies to reimburse Plaintiffs and the other Extra Expense Declaratory Judgment Class members for the full amount of Extra Expense losses incurred by Plaintiffs in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

107.   Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Extra Expense Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

   a.   Plaintiffs and the other Extra Expense Declaratory Judgment Class members' Extra Expense losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

   b.   Cincinnati is obligated to pay Plaintiffs and the other Extra Expense Declaratory Judgment Class members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Orders during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT IV – Breach of Contract – Extra Expense Coverage**
**(Brought on behalf of the Extra Expense Breach Class)**

108.   Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

24

109. Plaintiffs bring this Count individually and on behalf of the other members of the Extra Expense Breach Class.

110. Plaintiffs' Cincinnati insurance policies, as well as those of the other Extra Expense Breach Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs and the other Extra Expense Breach Class members' losses for claims covered by the policy.

111. In the Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form, Cincinnati also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have sustained if there had been no direct loss to property caused by or resulting from a Covered Cause of Loss.

112. "Extra Expense" includes expenses to avoid or minimize the suspension of business, continue operations, and to repair or replace property.

113. Due to COVID-19 and the Closure Orders, Plaintiffs and the other members of the Extra Expense Breach Class incurred Extra Expense at Covered Property Plaintiffs and the other members of the Extra Expense Breach Class have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

114. By denying coverage for any business losses incurred by Plaintiffs and the other members of the Extra Expense Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Cincinnati has breached its coverage obligations under the policies.

115.     As a result of Cincinnati's breaches of the policies, Plaintiffs and the other members of the Extra Expense Breach Class have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

**COUNT V – Declaratory Judgment – Civil Authority Coverage**
**(Brought on behalf of the Civil Authority Declaratory Judgment Class)**

116.     Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

117.     Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Declaratory Judgment Class.

118.     Plaintiffs' Cincinnati insurance policy, as well as those of the other Civil Authority Declaratory Judgment Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs and the other Civil Authority Declaratory Judgment Class members' losses for claims covered by the policy.

119.     Plaintiffs and the other Civil Authority Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs and the other Class members are entitled.

120.     Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

121.     An actual case or controversy exists regarding Plaintiffs and the other Civil Authority Declaratory Judgment Class members' rights and Cincinnati's obligations under the policies to reimburse Plaintiffs and the other Civil Authority Declaratory Judgment Class

26

members for the full amount of covered Civil Authority losses incurred by Plaintiffs and the other Civil Authority Declaratory Judgment Class members in connection with Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

122. Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Civil Authority Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

   a. Plaintiffs and the other Civil Authority Declaratory Judgment Class members' Civil Authority losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

   b. Cincinnati is obligated to pay Plaintiffs and the other Civil Authority Declaratory Judgment Class members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**COUNT VI – Breach of Contract – Civil Authority Coverage**
**(Brought on behalf of the Civil Authority Breach Class)**

123. Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

124. Plaintiffs bring this Count individually and on behalf of the other members of the Civil Authority Breach Class.

125. Plaintiffs' Cincinnati insurance policies, as well as those of the other Civil Authority Breach Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs and the other Civil Authority Breach Class members' losses for claims covered by the policy.

27

126.    Cincinnati agreed to "pay for the actual loss of 'Business Income'" sustained "and necessary Extra Expense" sustained "caused by action of civil authority that prohibits access to" the Covered Property when a Covered Cause of Loss causes direct damage to property other than the Covered Property, the civil authority prohibits access to the area immediately surrounding the damaged property, and "the action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage…."

127.    The Closure Orders triggered the Civil Authority provision under Plaintiffs and the other members of the Civil Authority Breach Class's Cincinnati insurance policies.

128.    Plaintiffs and the other members of the Civil Authority Breach Class have complied with all applicable provisions of the policies, and/or those provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

129.    By denying coverage for any business losses incurred and extra expenses sustained by Plaintiffs and other members of the Civil Authority Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Cincinnati has breached its coverage obligations under the policies.

130.    As a result of Cincinnati's breaches of the policies, Plaintiffs and the other members of the Civil Authority Breach Class have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

### COUNT VII – Declaratory Judgment – Sue and Labor Coverage
### (Brought on behalf of the Sue and Labor Declaratory Judgment Class)

131.    Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

28

132.     Plaintiffs bring this Count individually and on behalf of the other members of the Sue and Labor Declaratory Judgment Class.

133.     Plaintiffs' Cincinnati insurance policy, as well as those of the other Sue and Labor Declaratory Judgment Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs and the other Sue and Labor Declaratory Judgment Class members' reasonably incurred expenses to protect Covered Property.

134.     Plaintiffs and the other Sue and Labor Declaratory Judgment Class members have complied with all applicable provisions of the policies and/or those provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiffs is entitled.

135.     Cincinnati has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, such that the Court can render declaratory judgment irrespective of whether members of the Class have filed a claim.

136.     An actual case or controversy exists regarding Plaintiffs and the other Sue and Labor Declaratory Judgment Class members' rights and Cincinnati's obligations under the policies to reimburse Plaintiffs and the other Sue and Labor Declaratory Judgment Class members for the full amount Plaintiffs and the other members of the Sue and Labor Declaratory Judgment Class reasonably incurred to protect Covered Property from further damage by COVID-19.

137.     Pursuant to 28 U.S.C. § 2201, Plaintiffs and the other Sue and Labor Declaratory Judgment Class members seek a declaratory judgment from this Court declaring the following:

a.  Plaintiffs and the other Sue and Labor Declaratory Judgment Class members reasonably incurred expenses to protect Covered Property from further damage by COVID-19 are insured losses under their policies; and

b.  Cincinnati is obligated to pay Plaintiffs and the other Sue and Labor Declaratory Judgment Class members for the full amount of the expenses they reasonably incurred to protect Covered Property from further damage by COVID-19.

**COUNT VIII – Breach of Contract – Sue and Labor Coverage**
**(Brought on behalf of the Sue and Labor Breach Class)**

138.    Plaintiffs repeat and reallege Paragraphs 1-83 as if fully set forth herein.

139.    Plaintiffs bring this Count individually and on behalf of the other members of the Sue and Labor Breach Class.

140.    Plaintiffs' Cincinnati policies, as well as those of the other Sue and Labor Breach Class members, are contracts under which Cincinnati was paid premiums in exchange for its promise to pay Plaintiffs and the other Sue and Labor Breach Class members' losses for claims covered by the policy.

141.    In the Building and Personal Property Coverage Form and Business Income (And Extra Expense) Coverage Form, Cincinnati agreed to give due consideration in settlement of a claim to expenses incurred in taking all reasonable steps to protect Covered Property from further damage.

142.    In complying with the Closure Orders and otherwise suspending or limiting operations, Plaintiffs and other members of the Sue and Labor Breach Class incurred expenses in connection with reasonable steps to protect Covered Property.

30

143. Plaintiffs and the other members of the Sue and Labor Breach Class have complied with all applicable provisions of the policy and/or those provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations pursuant to the policies' clear and unambiguous terms.

144. By denying coverage for any Sue and Labor expenses incurred by Plaintiffs and the other members of the Sue and Labor Breach Class in connection with the Closure Orders and the COVID-19 pandemic, Cincinnati has breached its coverage obligations under the policies.

145. As a result of Cincinnati's breaches of the policies, Plaintiffs and the other members of the Sue and Labor Breach Class have sustained substantial damages for which Cincinnati is liable, in an amount to be established at trial.

## VII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Cincinnati as follows:

a.  Entering an order certifying the proposed nationwide Classes, as requested herein, designating Plaintiffs as Class representative, and appointing Plaintiffs' undersigned attorneys as Counsel for the Classes;

b.  Entering judgment in favor of Plaintiffs and the members of the Business Income Breach Class, the Civil Authority Breach Class, the Extra Expense Breach Class, and the Sue and Labor Breach Class; and awarding damages for breach of contract in an amount to be determined at trial;

c.  Entering declaratory judgments in favor of Plaintiffs and the members of the Business Income Declaratory Judgment Class, the Civil Authority Declaratory Judgment Class, the

Extra Expense Declaratory Judgment Class, and the Sue and Labor Declaratory Judgment Class as follows:

    i.    Business Income, Civil Authority, Extra Expense, and Sue and Labor losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their policies; and

    ii.    Cincinnati is obligated to pay for the full amount of the Business Income, Civil Authority, Extra Expense, and Sue and Labor losses incurred and to be incurred related to COVID-19, the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic;

d.  Ordering Cincinnati to pay pre- and post-judgment interest on any amounts awarded;

e.  Ordering Cincinnati to pay attorneys' fees and costs of suit; and

f.  Ordering such other and further relief as may be just and proper.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all matters so triable.

/s/ Tyler W. Hudson

| | |
|---|---|
| Tyler W. Hudson | MO # 53585 |
| Thomas A. Rottinghaus | MO # 50106 |
| Jack T. Hyde | MO # 63903 |

WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
(816) 701-1100 (telephone)
(816) 531-2372 (facsimile)
thudson@wcllp.com
trottinghaus@wcllp.com
jhyde@wcllp.com
**ATTORNEYS FOR PLAINTIFFS**